Between the MORRIS AND ESSEX RAILROAD COMPANY, appellants, and JOHN I. BLAIR and others, respondents.

1. Where charges of fraud are clearly made in the bill, and clearly and unequivocally denied in the answer, the answer must be taken as true, unless there is something in the circumstances of the case which shows that it is not and cannot be true.

2. Two railroad companies were incorporated to complete two independent lines across the state. No route was prescribed to either other than the termini. There was no conflict of routes on the face of the charters, and no necessary conflict in carrying out the objects of the charters.

3. *Held*, that the prior right attached to the company which first actually surveyed and adopted a route, and filed their survey in the office of the secretary of state.

4. That as no specific route was granted to either company, a right to no particular place accrued to either until they had selected or determined upon a location. That no importance should be attached to the fact that the charter of one company was passed seven days before that of the other.

5. The mere experimental surveying of a route will not confer any vested or legal right until it shall have been adopted.

6. By adopting and filing a survey of their route, a company acquires a right to obtain the lands over which it passed, and they cannot be deprived of that right by another company purchasing and taking deeds for those lands, even if made without notice.

7. Such conveyances could, at most, put the purchasers in the condition of land-owners, liable to have their lands taken upon making compensation.

8. It would not be in accordance with the practice of a court of equity, upon a mere injunction bill, to investigate and decide the legal title of two railroad companies, under their respective charters, to a conflicting route.

The injunction was issued in this cause upon the filing of the complainant's bill, by one of the masters, without notice to the defendants. Upon the coming in of the answer, an order was made dissolving the injunction. From that order the complainants appealed.

The grounds upon which the order dissolving the injunction was made, and a full statement of the case, is contained

in the opinion of Abraham Browning, Esq., one of the masters of this court, to whom the matter had been referred.

*Whitehead* and *Whelpley*, for complainants.

*Frelinghuysen* and *Bradley*, for defendants.

THE MASTER. The bill in this case was filed on the 28th day of July, 1853. It sets forth that the complainants were incorporated on the 29th day of January, 1835, and, by their charter, authorized to construct a railroad from the track of the New Jersey Railroad, either at Newark or at Elizabethtown, to the village of Morristown. That they were duly organized as a company on the 14th day of September, 1835; and that, under their charter, and a supplement passed March 2d, 1836, they constructed their road from Newark to Morristown, at a cost of two hundred and fifty-three thousand dollars. That the supplement authorized them to extend their road from Morristown to Dover; and that under it and a further suppplement, passed February 25th, 1846, they, in that year, determined upon a road to Dover, and subsequently extended their road to that town, at an additional cost of two hundred and eighty thousand dollars. That this extension was made for the purpose, and with the intention, of ultimately continuing their road to the Delaware river; and that, having determined that the time had arrived for carrying this intention into effect, they applied for, and, on the 19th of February, 1851, obtained, a further supplement, authorizing them to extend their road from Dover " to any point on the Delaware at or near the town of Belvidere, or the Water Gap, or between those places," and with power, by the consent of Pennsylvania, to construct a bridge across the river.

That under this last supplement, about the 18th day of November, 1851, they determined to extend their road to Hackettstown, which is about half way to the Water Gap, with a view of ultimately extending it thereto. That on the 16th of December, 1851, they resolved to increase their cap-

ital stock five hundred thousand dollars, for the purpose of constructing the extension to Hackettstown; and that on the 20th of February, 1852, they filed in the secretary of state's office a survey of their route to that place. That four hundred thousand dollars of the said increase of capital was subscribed for, a portion of which had been paid in, and eighty thousand dollars thereof had been expended on the Hackettstown extension, which was then being vigorously prosecuted and almost completed. That before obtaining their last supplement, they had become satisfied that the public convenience and their own interest required their road should be extended to the Water Gap, in consequence of which they had ordered an actual survey to be made, which was begun in February, 1850, and subsequently prosecuted with great labor and expense. That in November, 1851, they determined upon a general route through the Vanness Gap of the intervening mountains to the Water Gap; and that afterwards they made a particular survey through said gap, which their board of directors considered, approved and adopted, and on the 8th day of March, 1853, they deposited it in the office of the secretary of state, at Trenton. That this survey was made in good faith, and with a determination to construct the road as soon as the right of way could be obtained. That on the 12th of March they commenced purchasing the right of way of the land-owners; that on the 15th they purchased of one George Vass a portion of the route for one thousand dollars, and took his deed therefor in fee simple; that on the 17th they purchased another portion of one Lanning for one hundred and forty dollars, and took his deed; that on the 2d day of April they purchased another portion of one Taylor for six hundred dollars, and took his deed; and that they had expended in all twelve thousand dollars in purchasing the right of way along said route, and hoped to have the undisturbed possession thereof, to which, under and by virtue of the premises, they insist they are entitled.

The bill then sets forth, substantially, that one John I. Blair, and the other defendants associated with him, pre-

tending to act as a corporation by the name of "The War-
ren Railroad Company," and under a pretended organization
of that company, according to an act passed February 12th,
1851, entitled "An act to incorporate the Warren Railroad
Company," have taken fraudulent possession of the said lands
purchased of Vass, Taylor and Lanning, and claim a right
to have and hold the same, and to exclude and deprive the
complainants of their said route and lands; and that said
Blair and his associates have actually commenced making
fraudulent excavations upon said lands, under pretence of
constructing a railroad thereon, but in truth for the purpose
of fraudulently frustrating the complainants in the extension
of their road. That Blair and his associates pretend that
"The Warren Railroad Company" had been duly organized
on the 4th day of March, 1853, the stock subscribed for, the
president, directors and other officers appointed and elected;
that upon the same day, after being thus organized, they
duly adopted the survey of a route for a railroad through
the said Vanness Gap, and over the said lands of Vass, Tay-
lor and Lanning, which they filed in the office of the secre-
tary of state on the eighth day of the said month of March;
and that their survey was made, adopted, and filed before
the survey of the complainants. That Blair and his asso-
ciates also pretend that Taylor, Vass and Lanning executed
licenses or conveyances for their lands to the Warren Rail-
road Company before the aforesaid purchases of them by the
complainants. The bill charges that all their pretences are
untrue; that the organization of the Warren company was a
mere sham; that their survey was never actually made, but
was an imaginary survey on paper, indefinite, uncertain, and
gotten up and adopted for the fraudulent purpose of getting
possession of parts of the said route of the complainants, and
thereby thwarting their operations; that their said survey
was never duly adopted by the Warren company; that their
purchases of the right of way of Vass, Taylor and Lanning
were illegal and fraudulent; in short, that the whole pro-
ceedings of the Warren company were illegal and in bad
faith, without any *bona fide* intention of constructing a road,

but simply for the purpose of interfering with and stopping the operations of the complainants; as to whom, all their acts were fraudulent and void, and ought in equity to be set aside.

The bill prays that it may be decreed—

First. That the complainants' survey is valid, and sufficient to vest in them a right to acquire the lands on the route surveyed by them.

Second. That the conveyances by Taylor, Vass and Lanning to the complainants are valid, and sufficient to vest in them legal title to the lands.

Third. That the survey of the Warren company is fraudulent and void against the complainants.

Fourth. That the complainants' survey was first filed, and was the first valid acceptance of a grant from the state of the right of way over said route; and

Fifth. That the grants of Vass, Taylor and Lanning to the Warren company were illegal, fraudulent and void against the complainants.

It also prays for an injunction to restrain the defendants and all persons acting under them from all further proceedings; and for a subpœna for the defendants, including the Warren company by its corporate name.

Upon filing the bill an injunction was allowed and issued according to its prayer, which was subsequently modified, so as to restrain both parties from proceeding.

An answer to this bill was filed on the 15th of October last, by all of the defendants but two, George Vass and George W. Taylor, who, it is alleged in the answer, had parted with all their interest in the Warren Railroad Company, and resigned their offices as directors, before the bill was filed. This fact also appears in the affidavits of William E. Dodge and John I. Johnson, annexed to the answer, to whom Taylor and Vass had sold their stock, and who had been elected directors in their stead.

The answer admits the complainants' charter and supplements, and their organization as set forth in the bill, and

the construction of their railroad from Newark to Morristown, from thence to Dover, and that they were then engaged in extending it from Dover to Hackettstown, but at what cost and with what ulterior design, the defendants say they are ignorant. It also admits that the complainants made some general explorations or surveys of routes between Hackettstown and the Delaware river, but it denies that they actually surveyed and adopted any specific route until after the Warren company had surveyed and adopted the route in question. It also admits that the complainants surveyed a route from Hackettstown to the Water Gap, through the Vanness Gap, and over the lands of Vass, Taylor and Lanning; but it denies that that survey was either made or filed before the survey of the Warren company through the same gap and over the same lands. It also admits that the complainants purchased and received deeds for the lands of Vass, Taylor and Lanning, but it avers that such purchases and conveyances were after the same lands had been purchased by and conveyed to the Warren company, and with full knowledge of such prior purchases. It also admits that the Warren company had taken possession of the lands purchased of Vass, Taylor and Lanning, and made excavations for the purpose of making a railroad thereon, but avers that such possession and excavations were in good faith, and for the *bona fide* purpose of constructing a road, denying the fraud charged in the bill.

In justification of the acts of the defendants, the answer sets up the charter of " The Warren Railroad Company," by the legislature of New Jersey, granting them the right " to survey, lay out, and construct a railroad from some suitable place on the Delaware river, not more than five miles above the Delaware Water Gap, by the most feasible route, to intersect the road of the Central Railroad Company of New Jersey, at or near New Hampton," approved on the 12th day of February, 1851, seven days before the supplement authorizing complainants to extend their road from Hackettstown to the Delaware river.

The organization of the Warren company on the 4th of

March, 1853, by subscriptions to the capital stock; the election of Blair and the other individual defendants, directors; the organization of the board of directors, and the election of Blair as president, setting out with great particularity the whole proceeding, which organization it avers to have been in good faith, according to their charter, and for the purpose of carrying its object into effect, denying that it was a sham for the fraudulent purpose of thwarting the complainants, or for any other fraudulent or improper purpose. The answer then avers that, previous to this organization, a survey of the route from New Hampton to the Water Gap had been made, under the direction of Mr. Blair, and that that survey was, on the same 4th day of March, adopted by the board of directors of the Warren company; and that Mr. Blair was then directed to have the said survey filed in the office of the secretary of state.; and that he had it filed on the 8th day of March, before the complainants' survey was filed; that, having adopted and filed their survey, Blair, under authority of the Warren company, purchased and procured conveyances of Vass, Taylor, and Lanning, upon the line of the route, before the complainants purchased of them, of which the complainants had notice; and that the Warren company then entered upon these lands and commenced the construction of their road in good faith, which they intended to complete, and continued their work until restrained by the injunction. The answer admits that the two routes adopted by the companies conflict in the Vass and Vanness Gaps, but insists that these conflicts, by slight alterations on the part of complainants, could be avoided without any very considerable expense, but that if both roads cannot be made through the passes in the mountains where they conflict, the complainants must yield.

These are, substantially, the averments of the bill and answer, so far as necessary to understand the points in controversy; and if the complainants have a right to the continuance of the injunction, it must be on one of two grounds:

*First.* Fraud in the organization and proceedings of the Warren company ; or,

*Second.* A prior, legal, or equitable right in the complainants, to the lands where the routes conflict.

I. The fraud charged is that, knowing the intentions of the complainants to extend their road from Hackettstown to the Water Gap, Blair and his associates made a mere fictitious organization of the Warren company, adopted a paper survey of a route never actually run through the passes in the mountains where the complainants' road would pass, and then made purchases of the lands in those passes merely for the purpose of thwarting the complainants, without any *bona fide* intention of constructing a road there themselves.

These charges are clearly and unequivocally made in the bill, and, without entering into any critical examination, I think they are as clearly and unequivocally denied in the answer. In this respect the answer is responsive to the bill, and must, therefore, be taken as true, unless there is something in the circumstances of the case which shows that it is not and cannot be true. I am unable to discover any such circumstances ; on the contrary, the business and business relations of Mr. Blair, (who was undoubtedly the leading man in the organization of the Warren company,) detailed in the answer, his interests in the manufacture of iron in the State of Pennsylvania, his connection with the railroads in that state, then made and being made, and with which and the Central Railroad in this state, the Warren road would apparently make a very important link, completing a communication by railroad between his iron works and the city of New York, and the obvious interest which he and those connected in business with him had in forming such a communication, tend, in my view, greatly to confirm the answer.

It may be true, and I have no doubt is true, that Blair and his associates hastened the organization of the Warren company, and adoption and filing of a survey through the important passes of the mountains, and the purchasing of

the lands in those passes, in consequence of discovering that the complainants were about to locate, or would probably locate, the extension of their road there; but in this I see nothing fraudulent or illegal. They had a charter authorizing them to construct a road "by the most feasible route," from New Hampton to the Delaware, so as to perfect an important line of communication in which they were deeply interested; and if they discovered that this "most feasible route" was about to be occupied by the complainants, there was nothing illegal or fraudulent in hastening their organization and adoption of a survey, so as to secure the route to themselves. It is of no importance whether this was all done in one day or one month, provided there was a legal right to do it; nor is it any ground of objection with the complainants, that there was irregularity in the organization of the Warren company, provided an organazazation was actually made; they thereby became a corporation *de facto*, and their right to act as a corporation cannot be questioned by the complainants in this collateral way; and in my view, it is of as little importance whether the survey of the route was before or after the organization, or by whom, or under whose direction it was made. The adoption of it by the Warren company made it their own, as much so as if made after the organization, by a person employed by them for that purpose. These matters only become important in connection with the question of fraud, whether the proceedings of the defendants were in good or bad faith; the charges of fraud being fully met by the answer, the haste and irregularity of the proceedings become unimportant. This brings me to the second ground upon which the complainants rest their argument to have the injunction continued.

II. The prior, legal and equitable right to the conflicting portions of the routes of the two companies is a question of law, arising out of the charters of the companies, and their respective proceedings under them.

In the first place it should be observed, in reference to the roads of the two companies, as authorized by their

charters, that they start from entirely different points, some fifteen miles distant; the one from the then terminus of the Morris and Essex road, at Dover, in the county of Morris; the other from the line of the Central road, at New Hampton, in the county of Warren. Neither has a specific terminus assigned, The complainants are authorized to go to the Delaware river, anywhere between Belvidere and the Water Gap, a distance of fifteen miles; the Warren company may go the river anywhere below a point five miles above the Water Gap. One road is designed to connect the Morris and Essex road with the river; the other to form a connection between the Central Railroad and the river. They are to complete two independent railroad lines across the state, and there is no route granted or prescribed to either, other than their commencements and indefinite termini above described; nothing therefore appears upon the face of their charters creating a necessary conflict of routes; each company is at liberty to select its own route and its own termination upon the river, within the prescribed limits. It is not a case therefore of a prior grant of a specific route for a railroad by the legislature to one company, and a subsequent grant of the same route to another company, without repealing the former grant, or providing for compensation. If it were, upon principle and authority, the first company would take a vested right in the route, to the exclusion of the second. *Chesapeake & Ohio Canal Co.* v. *Baltimore & Ohio R. R. Co.*, 4 *Gill and Johns.* 1. There is no conflict on the face of the charters, and no necessary conflict in carrying out the objects of the charters. The conflict is one, not of necessity, but of choice in the selection of routes by the companies; and in my opinion, therefore, the prior right will attach to the company which first actually surveyed and adopted a route and filed their survey in the office of the secretary of state. The language of the charter of the Warren company is, " when the route of such road shall have been determined upon, and a survey of such route deposited in the office of the secretary of state, then it shall be lawful for said company to enter upon " and

construct their road. (Sec. 6.) The complainants' charter is substantially the same. (Sec. 6.) As no specific route was granted to either company, a right to no particular place could accrue to either, until they had selected or determined upon a location; consequently I attach no importance to the fact that the charter of the Warren company was passed seven days before the charter authorizing the extension of the complainants' road. At least I do not base my opinion on that fact; if entitled to any weight, it is in favor of the Warren company, whose charter gives them a right to the " most feasible route."

It may be true that the complainants first actually surveyed in the passes where the conflicts occur, although there seems to be some doubt on this subject. But, assuming it to be true, the mere experimental surveying of a route will not confer any vested or legal right, until it shall have been adopted. Until then the company is in no wise committed to it. If done by their direction, they may change their mind and go elsewhere. It may be the mere act of their engineer, and he may recommend it or not. If he should, the company may reject it and select another route. Although the complainants, therefore, may have first surveyed the conflicting passes in the mountains, yet the Warren company afterwards surveyed the same passes, and first adopted the route, and first filed their survey in the office of the secretary of state.

This gave them a legal right to the route surveyed, and in my view, excluded the complainants from occupying the same lands.

The bill charges that at the time of the adoption of the survey by the Warren company, on the morning of the fourth of March, they had no survey before them, that is, no map or formal written description of the exact route which the engineer had run. The answer substantially admits this. But the survey had then been actually made, and either from Mr. Blair, or in some other way, the directors knew where it had been run; and by resolution they adopted and approved of the line of location, as surveyed and made by Edwin McNeil, chief engineer, and under

his direction, "as now staked out," describing generally the route.   By another resolution they directed their president, Mr. Blair, to have the survey thus adopted mapped and filed.   This was subsequently done; so that a written survey was filed on the morning of the eighth, before the complainants had filed their survey, which was both adopted and filed on that day.   I do not think it was essential that the Warren company should have had a map or a formal written survey before them; or that such a map or survey should have been made at the time of the passage of the resolution adopting the survey made by McNeil.   It is sufficient if the survey had been made on the ground.   The adoption was of a survey thus made, that is, of the route or location; of which a map or writing would be mere evidence, and could be furnished afterwards from the field-notes of the engineer.

In this connection may be mentioned another objection urged against the survey of the Warren company, that it is uncertain and indefinite, being described by radii and curves, instead of a succession of angles of course and distance. Perhaps the former of these modes, if carefully done, is more accurate than the latter.   Either would enable an engineer to run the survey on the ground, and either mode is therefore sufficient.   But upon inspection of the Warren survey, in several instances it is not stated whether the curve is to the right or left, so that at those points some difficulty might arise.   These, however, are not the points where the routes conflict, and can no more be objected to by the complainants, than the Warren company could object to their survey, because, in transcribing, in some instances west had been written for east, or north for south.   I think the survey as adopted was sufficient.

The Warren company, by adopting and filing a survey of their route, acquired a right to obtain the lands over which it passed.   They could not be deprived of that right by the complainants purchasing and taking deeds for those lands, even if made without notice, and before the purchases by the Warren company.   Such conveyances could at most put

the complainants in the condition of land-owners, liable to have their lands taken by the Warren company upon making compensation. But, in fact, the Warren company first purchased and obtained deeds from Vass, Taylor and Lanning for the lands in the conflicting passes. Afterwards, the complainants, with a full knowledge of the prior purchases, purchased the same lands. This could confer no right, legal or equitable, against the Warren company.

It was strongly pressed, upon the hearing, that the complainants, by first making their road to Morristown, and extending it to Dover and Hackettstown, under the respective supplements to their charter, with a determination upon their part ultimately to obtain permission and extend their road to the Delaware river, acquired an equitable right to do so against the Warren company, which was not incorporated until after the Dover extension had been authorized and constructed, and after this determination had been conceived by the complainants.

The charter of the complainants, and its supplements, which had been passed before the incorporation of the Warren company, only authorized them to construct a road as far as Dover; and whatever may have been the designs, intentions and determinations of the complainants as to what they would ultimately prevail upon the legislature to permit them to do, and what they would ultimately accomplish, they surely could acquire no right, legal or equitable, to extend their road to the river, until they had obtained permission to do so. As to the construction of any road beyond the terminus fixed in their charter, and its supplements, they had and could have no right. The field of enterprise beyond was open to others as well as to them, and the justice or propriety of conferring additional powers upon them, or giving them to others, was for the consideration of the legislature. The acquisition of one corporate privilege will not draw to it a separate and independent corporate privilege. Corporations have no other rights or powers than those expressly granted or necessary to their enjoyment.

Besides, these determinations, if they really existed in the minds of the complainants, were never expressed or declared in the only way that a corporation can speak or declare its intentions : by resolutions passed or published by their board of directors.    Any other determinations than these are the mere opinions or resolves existing in the minds of the individual members.    They may or may not be the same in all, or a majority of the members.    The corporation, as such, is not responsible for nor can it predicate any rights upon them, until assumed by their board of directors.

The charges of fraud contained in the bill having been fully met by the answer, and the legal and equitable right to the conflicting portions of the routes being, in my opinion, in the Warren company, I think the injunction should be dissolved ; and I do, therefore, recommend to his Honor, the Chancellor, to dissolve the same, with costs.

The opinion of the Court of Appeals was delivered by

GREEN, C. J.    The injunction was issued in this cause upon the filing of the complainants' bill, by one of the masters, without notice to the defendants.    Upon the coming in of the answer, an order was made dissolving the injunction. From that order the complainants have appealed.

It is conceded by counsel that the simple inquiry for this court is whether the equity of the bill is fully met and denied by the answer ?    If it is, then, by the well-settled rules of the court of equity, the injunction was properly dissolved, and the order of the Chancellor must be affirmed.

The gravamen of the complainants' bill consists mainly in the charge of fraud in the organization of the Warren Railroad Company, and in the preparation and filing of the survey of their route.    The Warren Railroad Company, it is alleged, was organized, and the survey of their route made and filed, without the means or intention of constructing a road, but *mala fide*, for the purpose of anticipating and thwarting the operations of the defendants.

This charge is fully met and expressly denied by the defendants' answer. It is clearly set forth in the answer, in terms that admit of no equivocation, that the organization of the Warren Railroad Company was completed, their survey made and filed, and the work entered upon in good faith for the purpose of constructing their road under the authority of their charter upon the route thereby authorized. That the organization of the Warren road was irregularly or informally made—that it was made in great haste for the express purpose of gaining a priority over the complainants—are immaterial charges, except so far as they tend to support the charge of fraud. The existence of the Warren Railroad Company *de facto* cannot, it is admitted, be denied or called in question upon this investigation. So far as the charges of fraud are concerned, the equity of the bill is fully denied by the answer.

Independent of the charge of fraud, the complainants show no prior legal or equitable title over the defendants which entitles them to the aid of a court of equity. It would not be in accordance with the practice of a court of equity, upon a mere injunction bill, to investigate and decide the legal title of these parties, under their respective charters, to the route in question.

Upon the grounds clearly expressed in the opinion of the master, in compliance with which the order dissolving the injunction was made, the order should be affirmed, with costs.

Decree accordingly.

Decree affirmed unanimously.

CITED *in N. J. Southern R. R. Co.* v. *Long Branch Comm'rs*, 1 *Stew.* 33.